**Edward FAUGHNAN, Plaintiff,**

v.

**BIG APPLE CAR SERVICE, Arnold St. Hilaire, and United States of America, Defendants.**

**No. CV–91–3689.**

United States District Court,
E.D. New York.

July 20, 1993.

Charles Dobkin, Brooklyn, NY, for plaintiff.

Harold B. Berel, Berel & Mullen, New York City, Daniel F. DeVita, Asst. U.S. Atty., Brooklyn, NY, for defendants.

## MEMORANDUM AND ORDER

GLASSER, United States District Judge:

Plaintiff Edward Faughnan, a paraplegic confined to a wheelchair, brings this personal injury action against various actors whose behavior, or the behavior of their agents, allegedly resulted in an above-the-knee amputation of his right leg. Faughnan commenced this action in the Supreme Court of the State of New York, Kings County, in April of 1991, naming as defendant Big Apple Car Service ("Big Apple"). In August of 1991, Big Apple filed a third-party complaint against Arnold St. Hilaire—one of its drivers—and the United States Department of Veterans Affairs (the "VA"), alleging that agents of the VA Medical Center committed malpractice when treating Faughnan's injuries. Plaintiff thereafter added St. Hilaire as

a direct party defendant. On September 28, 1991, the United States removed the entire action to this court pursuant to 28 U.S.C. §§ 1441 and 2671 et seq. Plaintiff filed a second amended complaint on August 6, 1992, which named the United States Veterans Administration as a direct party defendant.[1]

Plaintiff now seeks a partial grant of summary judgment in his favor pursuant to Rule 56 of the Federal Rules of Civil Procedure. More specifically, Faughnan contends that Big Apple is vicariously liable for St. Hilaire's negligence; the latter's negligence, plaintiff argues, is shown by a November 1991 state court entry of default against St. Hilaire and confirmed by eyewitness testimony provided in affidavit form. With respect to the United States, plaintiff makes two arguments: first, that statements in a prior decision by the VA Ratings Board collaterally estop the United States from litigating the issue of whether personnel at the Bronx VA hospital committed medical practice; and second, that there are no genuine issues of material fact as to the liability and causation elements of plaintiff's medical malpractice claim. Plaintiff therefore argues that there is no triable issue concerning either defendant's liability. For the reasons provided below, plaintiff's motion is denied as to both defendants because material issues of fact remain.

## FACTS

The facts underlying the complaint in this action are undeniably tragic. On August 10, 1988, plaintiff went to the New York State Office of Vocational Rehabilitation ("OVR") at 111 Livingston Street, Brooklyn, New York, to discuss rehabilitation with Michael Hooker, a vocational rehabilitation counselor. (Affidavit of Edward Faughnan, dated May 12, 1993, at ¶ 2).[1] Mr. Hooker had arranged for an ambulette to take plaintiff to and from the OVR.[2] (Deposition of Michael Hooker at 9–10). The ambulette successfully transported Mr. Faughnan to the OVR (Faughnan Aff. ¶ 2); he was accompanied by an attendant named Ann Marie McCaffery. (Hooker Dep. at 10; Affidavit of Ann Marie McCaffery, dated May 12, 1993, at ¶ 3).

After the meeting between Faughnan and Hooker, the ambulette that was scheduled to escort plaintiff to and from the OVR departed without waiting to return Faughnan to his Brooklyn home. (Hooker Dep. at 9–10; Deposition of Edward Faughnan at 8–9). Accordingly, Mr. Hooker phoned defendant Big Apple, a private livery service, to perform this transportation service. Big Apple was included on a list promulgated by the New York State Department of Education for providing service to OVR. (Deposition of Eleanor Janover, OVR Account Representative for Big Apple, at 45, 92).

Defendant Big Apple admits that it dispatched a car driven by Defendant Arnold St. Hilaire to 111 Livingston Street for the purpose of taking Faughnan to his Brooklyn residence. (Big Apple's 3(g) Statement in Opposition; OVR Requisition Form, annexed as Plaintiff's Exh. B). However, defendant alleges that circumstances surrounding this dispatch raise a question as to Big Apple's vicarious liability for any resulting harm to plaintiff caused by St. Hilaire. First, Big Apple explains that it provides transportation through a radio dispatch service to which a number of independent limousine companies subscribe. (Affidavit of Heidi Spera, Big Apple Employee, dated May 27, 1993, at ¶¶ 3–4). Those companies use their own vehicles which they insure, control, and maintain; the companies also license the vehicles through the New York City Taxi & Limousine Commission ("TLC") and receive a 1099 form for tax purposes. (Spera Aff. ¶¶ 8–9). Payment for services is effected as follows: upon payment to Big Apple, a client (OVR, for example) receives a trip voucher; the voucher is given to the driver; the driver

---

1. As discussed in further detail below, in addition to paralysis, plaintiff suffers from a variety of other medical conditions including peripheral vascular disease, atherosclerotic heart disease, and a negative dorsalis pedulus pulse in his right leg. (See Exh. A to Plaintiff's Motion (VA discharge summary dated November 23, 1988)).

2. An ambulette is a modified van which, through the use of a portable ramp or a hydraulically operated lift, allows someone confined to a wheelchair to remain seated during transportation.

submits the voucher to Big Apple and receives payment. (Spera Aff. ¶¶ 6–7). LID Management Corp., one of the companies that subscribes to Big Apple's radio services, employs St. Hilaire as a driver and submitted a trip voucher to Big Apple for payment on the date in question. (Spera Aff. ¶¶ 10–11). Based on all of the above, Big Apple argues that St. Hilaire was not its employee but only an independent contractor.

Second, defendant claims that prior to dispatching a car and pursuant to the company's ordinary procedure, the Big Apple dispatcher inquired whether the passenger was wheelchair-bound and whether he was capable of transferring himself into the automobile. (Janover Dep. at 18; Janover Aff. ¶ 4). The reason for this inquiry was Big Apple's policy of not servicing handicapped persons unable to transfer themselves from wheelchair to vehicle. (Janover Dep. at 47–48). Defendant further alleges that plaintiff, through Mr. Hooker, responded that he indeed could transfer himself. (Janover Dep. at 18; Hooker Dep. at 13–18, 34). Plaintiff was trained at the Rusk Institute for Rehabilitation Medicine to use a slide board to effect such transfers; however, on this occasion, plaintiff did not have his slide board with him. (Faughnan Dep. at 15, 20–21). Plaintiff responds that he did not bring his slide board because he anticipated ambulette service but asserts that he has transferred himself without a slide board "many times before the accident." (Faughnan Aff. ¶ 7).

When the Big Apple car arrived, plaintiff requested that the driver assist in transferring him from his wheelchair to the vehicle by lifting plaintiff's torso and placing it in the front passenger seat. (Faughnan Aff. ¶ 4). According to the eyewitness testimony of Ann McCaffery, St. Hilaire agreed to help plaintiff but, in so doing, dropped him, thereby causing plaintiff's legs to come into contact with the pavement. (McCaffery Aff. ¶¶ 5–7). To date, Big Apple has not had an opportunity to depose Ms. McCaffery as plaintiff failed, despite requests, to supply her address prior to filing the motion papers now before this court. (Faughnan Dep. at

100–01). Plaintiff asserts that Big Apple's request for this deposition is untimely. (Reply Brief at 2).

Two passersby eventually assisted St. Hilaire in placing Faughnan in the vehicle. (Faughnan Aff. ¶ 5). He was then taken home by St. Hilaire from whom he received a Big Apple receipt. (Plaintiff's Exh. E). Faughnan eventually brought suit against Big Apple in state court; after Big Apple filed a third-party complaint against St. Hilaire, Faughnan amended his complaint to name the driver as well. As mentioned above, the United States (a party defendant for reasons discussed below) removed the action in September. For some reason, the state court nevertheless entered a default judgment against St. Hilaire on November 1, 1991; it is unclear whether Big Apple had an opportunity to contest the entry of default. (Exh. D).

### The United States

Since originally becoming a paraplegic, plaintiff has received and continues to receive disability benefits from the Department of Veterans Affairs, an agency of the United States. (United States Counter–3(g) Statement ¶ 1). He also has received medical care from various VA facilities and from other private hospitals as well. (Faughnan Dep. at 50, 60, 66). In addition to paralysis, plaintiff suffers from the following: astrocytoma of spinal cord at T–1 level resulting in spastic paraplegia; atrial fibrillation; atherosclerosis; peripheral vascular disease; right acromionplasty of the spine; congestive heart failure; penile implant; hypertension; obesity; chronic alcoholism; and chronic smoking. (Deposition of Dr. Chung–Chu Shang at 38, 61).

On August 11, 1988, the day after the accident discussed above, plaintiff was taken to the Bronx VA Hospital where he was x-rayed and diagnosed as having a fracture of his right lower leg. (Plaintiff's Exh. A).[3] An agent of the VA applied an Ace bandage to immobilize plaintiff's ankle. (Shang Dep. at 30–35). On August 12, 1988, at approximately noon, plaintiff was taken for a bath, at

---

**3.** The technical term is that he had a "nondisplaced right distal fibula fracture" and a "slightly displaced medial malleolar fracture." (Shang Dep. at 29–30; Morris Dep. at 19).

which time his Ace bandage was removed. When plaintiff returned to his room, he asked the nurse's aid who was assisting him to help reapply the bandage. (Deposition of Nurse Emily Garcia at 26–39). The nurse's aid did so and allegedly checked for tightness. (Garcia Dep. at 32–38).

On August 13, 1988, at approximately 6:00 p.m., nurses removed the Ace bandage from plaintiff's leg and noticed that the leg was discolored. (Faughnan Aff. at 9(b); Deposition of Dr. Paul T. Morris at 20). In a report prepared at that time, Dr. Paul T. Morris, a resident surgeon who conducted a vascular surgery consult for plaintiff, attributed the discoloration to the "tourniquet like action of the Ace bandage." (Morris Dep. at 21; Plaintiff's Exh. G). In deposition testimony, Dr. Morris explained as follows concerning application of the Ace bandage:

Q: Doctor, I want you to assume that there has been testimony by the nurse who reapplied the Ace bandage on the 12th that she—that she checked it by sliding her fingers underneath at either end and that it didn't appear to be too tight to her. Do you have an opinion with a reasonable degree of medical certainty whether that is an acceptable and good way of checking an Ace bandage for tightness given the fact that the patient had a fracture?

A: That appears to be an acceptable method of checking the tightness of an Ace bandage, and I have to qualify that with two statements. No. 1 is the amount of swelling around the ankle fracture changes minute by minute and hour by hour. So what was originally not too tight may have progressed to something that had become too tight because the swelling had increased. That is a general statement. I don't know the status of this man's swelling on the—because I met him afterwards.

Q: We understand that, of course.

A: But in—as a general rule the—the swelling of an ankle fracture tends to get larger over the course of time; and, thus, if the Ace bandage does not change but the swelling does, it can cause an overall change in things.

(Morris Dep. at 113–14). Dr. Chung–Chu Shang, a staff physician at the Bronx VA and plaintiff's treating physician, testified that application of the Ace bandage to immobilize the fracture was proper medical care. (Shang Dep. at 31–32).

Dr. Morris also testified that on August 12, 1988, as reflected in a medical chart, plaintiff informed an unidentified orthopedic surgeon at the VA hospital that plaintiff had no dorsalis pedis pulse for five years prior to his admission on August 11, 1988. (Morris Dep. at 93–94). Dr. Morris himself knew that plaintiff had no palpable pulse in his right foot. (Morris Dep. at 63).

As documents appended to the government's motion paper's indicate, plaintiff's foot apparently began to improve as early as the evening of August 13th. (*See* Exh. A). At approximately 7:30 p.m., Dr. Morris observed that the color of plaintiff's right foot was slowly returning to normal. (Morris Dep. at 20). On the 14th, 17th, and 23rd of August, Dr. Morris noted further improvements in the foot. (Morris Dep. at 50, 53, 62, 85 & Exh. A). Also on August 14th, Dr. Shang opined that the discoloration had improved and the foot could be saved. (Shang Dep. at 25–17, 77). On August 21st, Dr. Peter Galpin, a surgical resident, found Faughnan's foot to have a good chance for long-term viability. (Morris Dep. at 95–96).

Plaintiff apparently experienced a change in arteriovascular status on approximately August 23rd or 24th of 1988. (Morris Dep. at 86). Two vascular surgical attending physicians—Dr. Charoenkul and Dr. Schwartz—examined plaintiff's foot. Dr. Charoenkul concluded that the foot would require amputation. Dr. Schwartz concurred, noting that the foot appeared far more threatened than it had in an examination ten days earlier; he attributed the change to a thrombosis or embolism based on plaintiff's history. (Morris Dep. at 74–76). On September 16, 1988, approximately one month after the accident, plaintiff underwent an above-the-knee amputation of his right leg. The medical records and a pathology report prepared in September of 1988 indicate that plaintiff had suffered a thrombosis of the popliteal artery

(the main artery in his foot) which restricted blood flow; the cause of blockage is unclear.[4]

Plaintiff applied for VA disability benefits pursuant to 38 U.S.C. § 1151,[5] and received a 60% award for the loss of use of his right leg. (Faughnan Dep. at ¶¶ 10–11; Affidavit of Robert J. Dolan, Adjudication Officer for the New York Regional Office of the Department of Veterans Affairs, dated July 1, 1993, at ¶¶ 2, 5). In finding plaintiff eligible for this award, the VA Ratings Board made the following observations on May 4, 1990:

> The veteran has sustained a fracture of the left ankle on 8–10–88 and had been hospitalized on 8–11–88; an ace bandage had been utilized to immobilize the ankle in the hospital in spite of a known history of circulatory deficits with negative dorsalis pedilus pulse for 5 years, ASHD, peripheral vascular disease. Within 2 days, a purple discoloration of the foot was noted. Efforts to improve circulation were initiated; upon with [sic] appearance of dry gangrene, the viability of the limb was questioned. On 9–7–88, a notation is of record (without form 2633) that an ace bandage had been applied on 8–12 by a nursing assistant. Ultimately the limb was amputated on 9–16–88, above the knee.
>
> Entitlement to benefits under 38 USC 351 is warranted. *In view of the veteran's existing vascular history, it was negligent to apply a device restrictive of circulation for immobilization of the fractured limbs; other devices which solely immobilize the ankle without pressure might have been utilized, as complications, due to his vascular condition should have been anticipated.*

(Exh. I). Contrary to plaintiff's representations, the above determination was made by the Ratings Board and not the Board of Veterans Appeals (BVA); the significance of this difference is that a proceeding before the Ratings Board is nonadversarial and ex parte, without testimony, cross examination, or representation by counsel. Prior to this award, plaintiff had received a wholly separate special monthly dependency compensation rating which arose from his being homebound since 1980 as a result of his spinal condition. (Dolan Aff. at ¶ 5; Exh. I at 3). It is also helpful to note that no appeal was taken of the Ratings Board determination and, despite plaintiff's representations to the contrary, no BVA determination that plaintiff should receive a 100% award ever occurred.

## DISCUSSION

Under the familiar standard of Rule 56, summary judgment is appropriate where there is no genuine issue as to any material fact. Put differently, the question to be resolved by the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Summary judgment is therefore appropriate against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554–55, 91 L.Ed.2d 265 (1986). As the Supreme Court stated in *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986), the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." And, insofar as granting a motion for summary judgment "deprives a party of its day in court and the right to present its cause to a jury, the district court in examining the record must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving

---

**4.** It is possible that the thrombosis resulted from plaintiff's atrial fibrillation which could have caused a blood clot to form and lodge in the arteries of the right leg or from plaintiff's atherosclerosis which restricted blood flow. (Morris Dep. at 87; Shang Dep. at 85–88). It also appears possible that the application of the Ace bandage aggravated either of these conditions.

**5.** The statutory section at the time of application was 38 U.S.C.A. § 351; that section was later amended by Public Law No. 102–83 (1991) is now found at 38 U.S.C. § 1151.

party." *Gibson v. American Broadcasting Cos.*, 892 F.2d 1128, 1132 (2d Cir.1989). Bearing these principles in mind, this court turns to the substantive law and facts now at issue.

■ Jurisdiction in this action rests on the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* Under that statute, a federal court is to determine liability by applying the state law that would apply to "a private individual under like circumstances." 28 U.S.C. § 2674; *Rodriquez v. United States*, 823 F.2d 735, 739 (3d Cir.1987). The parties agree that New York law applies to this action.

### Liability of Big Apple

Plaintiff's argument for summary judgment as to liability against Big Apple rests on the following: a default judgment was entered against St. Hilaire in state court; even absent this judgment, eyewitness testimony indicates that St. Hilaire dropped Faughnan; Big Apple was St. Hilaire's employer but even if St. Hilaire was an independent contractor, plaintiff believed that he was dealing with a Big Apple employee and relied on this belief; and Big Apple had a nondelegable, statutory duty to transport plaintiff in a careful manner. As to each of these assertions, however, genuine issues of fact predominate.

■ As a preliminary matter, it is not clear that there is, in fact, a valid default judgment against St. Hilaire since the state judgment was entered one month after the entire action was removed to this court. Moreover, given the circumstances of this case, a default judgment of liability against St. Hilaire should not be deemed binding against Big Apple: the latter was sued as a named defendant in the same action; has answered in the action; has filed a third-party complaint against St. Hilaire; contests the existence of a relationship that gives rise to vicarious liability; and contests that St. Hilaire was negligent. Thus, the facts here differ materially from the facts in cases where New York courts have found entry of default to have preclusive effect. *See Guido v. New York Telephone Co.*, 145 A.D.2d 203, 538 N.Y.S.2d 87 (3d Dep't. 1989) (affirming grant of summary judgment for general contractor as against subcontractor based on two factors: prior denial of motion to vacate default judgment against contractor based on nonmeritorious defenses; and fact that subcontractor, who engaged in blasting, was strictly liable); *New Paltz Cent. School Dist. v. Reliance Ins. Co.*, 97 A.D.2d 566, 467 N.Y.S.2d 937 (3d Dep't 1983) (in A-1, contractor and principal on performance bond sued school district and default judgment was entered against latter; in A-2, cited above, district sued surety and court held that "jural relationship between [contractor], as principal on the bond, and defendant as surety, is of such a nature that defendant stands in contractor's shoes for *res judicata* purposes in the instant action. A person not a party to a prior action, but only derivatively or vicariously liable for the conduct of another, may invoke the *res judicata* effect of a prior judgment on the merits in that action in favor of the one primarily liable."). Research reveals no New York case which allows a personal-injury plaintiff to invoke a default judgment against an employee as preclusive proof of liability for negligence against the employer.

■ Second, if this court does not give *res judicata* effect to the default judgment, issues of fact remain concerning St. Hilaire's alleged negligence and Faughnan's comparative negligence. As a preliminary matter, summary judgment in negligence cases "continues to be a rare event." *Andre v. Pomeroy*, 35 N.Y.2d 361, 362 N.Y.S.2d 131, 320 N.E.2d 853 (1974). In other words, "[s]ince negligence actions usually involve many issues of fact, including the reasonableness of the parties' conduct, they are rarely subject to being dismissed by a motion for summary judgment." *Heimrich v. Stevens*, 67 A.D.2d 1093, 415 N.Y.S.2d 158 (4th Dep't 1979) (*citing Scurti v. New York*, 40 N.Y.2d 433, 442, 387 N.Y.S.2d 55, 354 N.E.2d 794 (1976)). This proposition rings even more true in a case such as this one where St. Hilaire's negligence is demonstrated only through plaintiff's testimony and the affidavit of McCaffery, who defendants assert they have not had the opportunity to depose. *Cf. Mack v. Arnold Gregory Memorial Hospital*, 90

A.D.2d 969, 456 N.Y.S.2d 560 (4th Dep't 1982) (holding that summary judgment should be denied where facts are exclusively in control of moving party and pretrial disclosure may reveal those facts).

Summary judgment principles also are important to keep in mind in this regard. Faced with a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Celotex*, 477 U.S. at 249, 106 S.Ct. at 2511. For this court to determine the reasonableness of St. Hilaire's behavior based only on affidavit testimony would distort the role of this summary procedure.

■ Third, even assuming that St. Hilaire is found to be undisputedly negligent, the parties dispute the facts surrounding and defining the relationship between St. Hilaire and Big Apple which would give rise to vicarious liability on behalf of the latter. " 'Whether a person is an "employee" or an "independent contractor" is an ultimate fact to be determined from the evidence itself. It may be called a conclusion to be drawn from the contract itself, the attitude of the parties toward each other, the nature of the work and all relevant circumstances.' " *Favale v. M.C.P. Inc.*, 125 A.D.2d 536, 537, 509 N.Y.S.2d 425 (2d Dep't 1986) (*quoting Felice v. St. Agnes Hospital*, 65 A.D.2d 388, 396, 411 N.Y.S.2d 901 (2d Dep't 1978)). Plaintiff alleges and defendant disputes that the vehicle involved in the accident—designated 973 by Big Apple (Janover Dep. at 27, 29, 60)—carried a Big Apple sticker. (Janover Dep. at 60–61). The parties also dispute whether St. Hilaire was utilized regularly as a Big Apple driver. (Janover Dep. at 34). Finally, Big Apple admits that it provides training for its drivers but disputes the characterization of that training: the lessons are limited to instructions for assisting clients with opening and closing of their wheelchairs and the opening and closing of car doors; no instruction is given for transferring wheelchair-bound persons into cars. (Janover Dep. 47–48; Janover Aff. ¶ 7).

Equally unresolved are the facts which form the basis for plaintiff's argument that even if St. Hilaire technically was an independent contractor, Big Apple held itself out as his employer and plaintiff relied on this representation, thereby justifying imposition of vicarious liability. Notably, plaintiff fails to make clear the "reliance" to which he is referring; after all, Mr. Hooker made all the arrangements with Big Apple. Reference to *Miles v. R & M Appliance Sales, Inc.*, 26 N.Y.2d 451, 311 N.Y.S.2d 491, 259 N.E.2d 913 (1970), a case from the New York Court of Appeals on which plaintiff relies, demonstrates why summary judgment is inappropriate on this issue at this juncture. In *Miles*, a personal injury action brought by the purchaser of an air conditioning unit against the vendor, the question was whether the vendor was liable for the negligence of an independent contractor. The plaintiff had complained that the appliance was defective, and the defendant responded by engaging an independent contractor to repair the unit. When the contractor redelivered the air conditioner, he placed it so that it caused plaintiff to trip and injure herself. *Miles*, 26 N.Y.2d at 453, 311 N.Y.S.2d 491, 259 N.E.2d 913. The court of appeals found the vendor vicariously liable for the independent contractor's negligence under the following rationale:

By the terms of its written contract, R & M made no warranties, express or implied, other than those contained in the written agreement. That instrument imposed no obligation on R & M to repair the air-conditioning unit. Liability here, however, is not dependent upon any obligation to repair. R & M undertook to repair the unit, apparently as part of its customer relations policy so that, regardless of its contractual obligation, it became bound to fulfill the assumed responsibility with reasonable care. Encompassed within the assumed duty was the repair and, collaterally, the careful redelivery and reinstallation of the machine. The delegation of the performance of the assumed responsibility to Rondel, an independent contractor, does not absolve R & M from liability for Rondel's negligence.

In the case of alleged independent contractors, the general rules of agency have

been so modified by exception that they do not control under these circumstances. The applicable principle is stated in the Restatement as follows: "One who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being rendered by the employer or by his servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants" (Restatement 2d, Torts, § 429). The rule is applicable if "the negligence of the contractor consists * * * in carelessness in the detail of rendering them" (Restatement, 2d, Torts, § 429, Comment b).

*Id.* at 453–54, 311 N.Y.S.2d 491, 259 N.E.2d 913 (citations omitted). The *Miles* plaintiff had testified credibly of the vendor's assurances that the unit would be repaired; the court found that delivery was a necessary incident of that repair. *Id.* at 454, 311 N.Y.S.2d 491, 259 N.E.2d 913; *see also Mondello v. New York Blood Center,* 80 N.Y.2d 219, 590 N.Y.S.2d 19, 604 N.E.2d 81 (1992) (explaining that rationale of Section 429 depends on what duty is assumed and what public representations are made by the party against whom vicarious liability is sought); *Mduba v. Benedictine Hospital,* 52 A.D.2d 450, 384 N.Y.S.2d 527 (3d Dep't 1976) ("Defendant [hospital] having undertaken to treat decedent ... was under a duty to do so effectively. Patients entering the hospital through the emergency room, could properly assume that the treating doctors and staff of the hospital were acting on behalf of the hospital. Such patients are not bound by secret limitations as are contained in a private contract between the hospital and the doctor.").

In contrast, the parties in this case dispute the duty that Big Apple assumed in dispatching a car to transport plaintiff. Big Apple admits that OVR was a regular client for whom Big Apple sometimes transported handicapped persons. (Janover Dep. at 45, 92). Big Apple also admits that it received a call from OVR on the date in question requesting that plaintiff be taken to his Brooklyn home and that St. Hilaire, a driver for LID Management, won the bid. (Janover Aff. ¶ 13). Big Apple argues, however, that its dispatch was made only after Faughnan's representation that he could get himself into the vehicle, (Janover Dep. at 13, 18–19; Janover Aff. ¶¶ 9–12); this decision results from a Big Apple corporate policy which bars drivers from assisting wheelchair-bound clients in transferring themselves into a vehicle. (Janover Aff. ¶¶ 4–8). Big Apple asserts that had it known of plaintiff's true condition, it would not have announced the call over its radio. Plaintiff disputes the existence of Big Apple's policy—which is not in writing and was not filed with the TLC (3(g) Statement ¶¶ 51, 53—and alleges that Big Apple failed to communicate this policy to St. Hilaire. As the above facts make clear, there is a genuine dispute concerning any basis for plaintiff's reliance and therefore the applicability of *Miles.*

■ Finally, plaintiff argues that Big Apple has a statutory—or nondelegable—duty to assist handicapped patrons in entering vehicles based on the fact that cars dispatched by Big Apple are "for-hire vehicles" which are subject to regulations promulgated by New York City for members of the TLC. In *Kleeman v. Rheingold,* 81 N.Y.2d 270, 598 N.Y.S.2d 149, 614 N.E.2d 712 (1993), the New York Court of Appeals explained the inquiry involved in analyzing assertions of nondelegable duties:

There are no clearly defined criteria for identifying duties that are nondelegable. Indeed, whether a particular duty is properly categorized as "nondelegable" necessarily entails a sui generis inquiry, since the conclusion ultimately rests on policy considerations.... The most often cited formulation is that a duty will be deemed nondelegable when " 'the responsibility is so important to the community that the employer should not be permitted to transfer it to another.' " ... This flexible formula recognizes that the "privilege to farm out [work] has its limits" and that those limits are best defined by reference to the gravity of the public policies that are implicated.

*Kleeman*, 81 N.Y.2d at 275, 598 N.Y.S.2d 149, 614 N.E.2d 712 (1993) (holding lawyer vicariously liable for process server's failure to serve within requisite time period based on "comprehensive" Code of Professional Responsibility, society's vision of what lawyers do, and lawyers' exclusive franchise over their profession) (citations omitted); *see also Hermance v. Daddy–O's Restaurant Corp.*, 159 A.D.2d 924, 553 N.Y.S.2d 239 (3d Dep't 1990) (question of whether duty is nondelegable is one of fact for jury). In this case, the responsibility of reasonable care is imposed pursuant to a regulation of the TLC. That regulation requires a for-hire vehicle to exercise heightened care and "*reasonable* assistance" in transporting handicapped persons, which includes reasonable assistance in helping those persons into vehicles. Whether Big Apple had a nondelegable duty to ensure that St. Hilaire rendered "reasonable" assistance and, more importantly, whether "reasonable" assistance was in fact rendered is a question properly left to the community as represented by a jury.[6] For all of the above reasons, plaintiff's motion for summary judgment as to the liability of Big Apple is hereby denied.

### Liability of Defendant United States

Plaintiff's motion for summary judgment as against the United States is similarly denied. Plaintiff argues that statements by the VA Ratings Board should collaterally estop the United States from asserting that its doctors were not negligent. Issue preclusion—collateral estoppel—bars relitigation of issues "actually adjudicated and essential to the judgment, in a prior litigation between the same parties." *United States v. Island Park*, 791 F.Supp. 354, 377 (E.D.N.Y.1992). The Second Circuit has set forth the following criteria for finding issue preclusion:

> (1) the issues in both proceedings must be identical, (2) the issue in the prior proceedings must have been actually litigated and actually decided, (3) there must have been full and fair opportunity for the litigation in the prior proceeding, and (4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits.

*Beck v. Levering*, 947 F.2d 639, 642 (2d Cir. 1991) (*quoting Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 44 (2d Cir.1986), *cert. denied*, —— U.S. ——, 112 S.Ct. 1937, 118 L.Ed.2d 544 (1992)); *see also Murphy v. Gallagher*, 761 F.2d 878, 881 (2d Cir.1985) (in New York courts, "the doctrine of collateral estoppel ... precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same.").

The parties spend a great deal of time discussing what the Ratings Board did and did not decide in light of a later determination by the Board of Veterans Appeals that the standard under which the Ratings Board was operating (e.g. a necessary finding of "carelessness, negligence, lack of proper skill, error in judgment") exceeded statutory authority. *See Gardner v. Derwinski*, 1 Vet. App. 584 (1991). However, these arguments are irrelevant in light of plaintiff's failure to demonstrate (1) that the issue decided in the earlier proceeding was identical to the issue of medical malpractice now before this court[7]

---

**6.** Plaintiff also relies on *Mondello v. New York Blood Center*, 175 A.D.2d 718, 573 N.Y.S.2d 665 (1st Dep't 1991), *reversed*, 80 N.Y.2d 219, 590 N.Y.S.2d 19, 604 N.E.2d 81 (1992). The *Mondello* court, after reversing the appellate division's finding of vicarious liability based on policy statements in various Department of Health regulations later determined not to be in effect at the relevant time, essentially highlighted the importance of examining the factual basis for the relationship between the parties before determining that vicarious liability was appropriate.

**7.** To prove a case of medical malpractice under New York law, a plaintiff must establish breach of the following duty:

> A physician's obligations to his patient are to possess at least the degree of knowledge and skill possessed by the average member of the medical profession in the community in which he practices, to exercise ordinary and reasonable care in the application of that professional knowledge and skill, and to use his best judgment in the application of his knowledge and skill.

*Sitts v. United States*, 811 F.2d 736, 739 (2d Cir.1987). There is no indication of what standard governed the Ratings Board determination.

and (2) that the prior proceeding offered a full and fair opportunity to litigate the question of whether the VA doctor committed malpractice.[8] The requirements for issue preclusion are designed to apply to precisely this type of case: where there is little opportunity or incentive for the United States to oppose a benefits award but significant incentive to oppose a tort judgment. Moreover, as the statement of facts makes clear, there are genuine issues going to the causation element of plaintiff's negligence claim against the United States given the steady improvement and then subsequent decline in plaintiff's leg condition. Thus, summary judgment on the issue of liability is not appropriate.

## CONCLUSION

For the reasons provided above, plaintiff's motion for summary judgment is hereby denied.

SO ORDERED.

---

8. As mentioned earlier, proceedings before the Ratings Board are nonadversarial: no witness testimony was offered; the United States did not have the opportunity to call or cross examine witnesses; and the applicant alone may appeal an adverse determination. *Cf. Delamater v.* *Schweiker*, 721 F.2d 50, 54 (2d Cir.1983) (doctrine of administrative res judicata not applicable where there was "no hearing, no testimony, no subpoenaed evidence, no argument, no opportunity to test any contention by confrontation).